

**SunTrust**

**Visa® Commercial Card Agreement**
**Corporate Liability**

This Visa Commercial Card Agreement ("Agreement") between SunTrust Bank ("Bank") and _____ Taylormade Creations ("Company") located at 7108 Crossroads Blvd, Ste 308, Brentwood, TN 37027

**Recitals**

A. The Company has applied to the Bank for Visa® commercial card account services ("Program") to be established in the name of the Company.

B. The Bank agrees to provide the Program to the Company under the terms and conditions stated below and the Schedules, Exhibits and Addendums attached to this Agreement, which are incorporated herein by this reference.

**Terms and Conditions**

1. **Definitions.**

    (a) **"Activation Date"** means the date the first Card is used by the Company for a purchase transaction.

    (b) **"Affiliate"** means any corporation or other entity which controls, is controlled by, or is under common control with, the Company. For purposes of this definition, "control" means direct or indirect ownership of more than 50% of the voting interest or economic interest in a corporation or more than 50% of the equity interests in the case of any other entity, or such other relationship whereby a party controls or has the right to control the Board of Directors or equivalent governing body of a corporation or other entity.

    (c) **"Authorized User"** means any person other than a Cardholder, whom the Company or any Cardholder authorizes to use the Card.

    (d) **"Card"** or **"Cards"** means any physical card and/or Card Account issued by the Bank to the Company for its Cardholders.

    (e) **"Card Account"** means the account number established for each Card under the Company Account for posting Card transactions and other account activities.

    (f) **"Card Credit Limit"** means the credit limit of each Card Account in effect from time to time.

    (g) **"Cardholder"** or **"Cardholders"** mean the individual in whose name a Card is issued or who is designated by the Company as being expressly authorized to use a Card. The Company acknowledges that this definition of a Cardholder is for the purpose of this Agreement only and may not apply with respect to other commercial card services or features including the Visa Corporate Liability Waiver or Travel Insurance programs.

    (h) **"Cardholder Agreement"** means the agreement between the Bank and a Cardholder governing the use of a Card attached to this Agreement as Schedule D, as may be amended by the Bank from time to time.

    (i) **"Cash Advances"** means cash obtained from any financial institution, merchant, or automated teller machine ("ATM") or money orders, travelers checks or similar cash-like transactions.

    (j) **"Charges"** means all purchases and Cash Advances charged to the Company Account or Card Account.

    (k) **"Company"** means the Company described above and, if applicable, any of its Affiliates designated by the Company on the attached Schedule C. The Company shall have the right to amend Schedule C, to (i) delete one or more of its Affiliates upon written notice to the Bank; and (ii) add designated Affiliates upon the prior approval of the Bank.

    (l) **"Company Account"** means the account to be established by the Bank in the name of the Company. The Company Account includes one or more Card Accounts each with a specified account number.

    (m) **"Company Credit Line"** means the credit limit established for the Company.



EXHIBIT B

(n) **"Confidential Information"** means all non-public information regarding the parties and Personally Identifiable Information. Confidential Information does not include information that (i) is or becomes generally known to the public not as a result of a disclosure by either party, (ii) is rightfully in the possession of the receiving party prior to disclosure by the disclosing party without the obligation of confidentiality, (iii) is received by the receiving party in good faith and without restriction from a third party, not under a confidentiality obligation to the disclosing party and having the right to make such disclosure, (iv) is independently developed by the receiving party without use of or access to the disclosing party's Confidential Information, or (v) is disclosed with the prior written approval of the disclosing party.

(o) **"Fees"** mean the fees described on the attached Schedule B.

(p) **"Personally Identifiable Information"** means the Company's information obtained by the Bank by virtue of the Bank's provision of the services requested by the Company under this Agreement including Cardholder names, addresses, telephone numbers, email addresses, Card information, Card numbers, Credit Limits, account information and other personally identifying information.

(q) **"Program Administrator"** means the person(s) the Company designates on Schedule A, in connection with the day-to-day operation and administration of the Program as described in Section 4(b).

(r) **"Unauthorized Use"** means the use of a Card by a person other than a Cardholder or Authorized User who does not have actual, implied, or apparent authority for such use, and from which the Company, Cardholder and/or an Authorized User received no benefit, directly or indirectly.

2. **Services.**

    (a) The Bank will establish a Company Account for the Company under the Program with the initial Company Credit Line and otherwise in the manner described in this Agreement, the Schedules, Exhibits and Addendums. The Bank shall have sole discretion over the management, operation, content and features of the Program and, subject to the terms of this Agreement, may from time to time modify any aspect of the Program.

    (b) The Bank will lend money to the Company (and Cardholders) up to the Company Credit Line and Card Credit Limits by way of Charges to the Card Accounts in accordance with this Agreement. The Charges and Fees owed by Company may not exceed the Company Credit Line at any time. The Bank reserves the right, in its sole discretion, to modify the Company Credit Line and the Card Credit Limits at any time.

3. **Charges and Fees.**

    (a) The Company and its Cardholders may use the Cards to (i) charge the purchase of goods or services; and (ii) receive Cash Advances. Any such use of a Card, whether or not the Card was presented (such as Internet, mail or telephone order purchases) or the Cardholder's signature was obtained, or by use of a PIN, results in a Charge to the Card Account. For each Cash Advance, the Bank adds an additional Fee to the Cash Advance balance as described in Schedule B. The amount of the Cash Advance also may include a surcharge imposed by the merchant.

    (b) The Bank and Visa convert any Charge made in a foreign currency into U.S. dollars using the conversion rate in effect on the day the transaction is posted to the Company Account or any Card Account (currently either a wholesale market rate or a government-mandated rate) and adds a Visa conversion charge and the Bank's current conversion charge, not to exceed 2% of the Charge amount (the "Foreign Exchange Fee"). The currency conversion rate and Foreign Exchange Fee may not be the same as existed on the day the Cardholder made the transaction. The Bank and Visa will use this procedure if a credit is subsequently given for the transaction. The currency conversion rate on the date of the original transaction may differ from the rate in effect on the date the credit was issued. The Bank will deduct the Foreign Exchange Fee from this credit amount. As a result, the amount of the credit may be different from the amount that was originally charged for the transaction. The amount of the transaction after conversion (including Foreign Exchange Fee) is shown on the statement as either a purchase or cash advance.

    (c) <u>Late Payment Fees</u>. If the amount due in the periodic statement is not paid in full on or before the stated payment due date, the unpaid portion of the outstanding balance will be shown in subsequent periodic statements as a "past due amount". If the past due amount is greater than twenty-five dollars ($25.00), a fixed dollar amount or percentage of the past due amount as described in the attached Schedule B ("Late Payment Fee") may be assessed to the Company Account or Card Account in the periodic statement. If the past due

amount is not paid, the Late Payment Fee may be assessed in each subsequent periodic statement until full payment is made.

4. **Company Responsibilities.**

   (a) By signing this Agreement, the Company is bound by all of the terms and conditions and any subsequent amendments. The Company agrees (and agrees to notify its Cardholders) that the Card may be used for business purposes only and shall not be used for personal, family or household purposes, or for any transaction illegal under state or federal law (such as casino gambling on the Internet). The Company shall be solely responsible for establishing and monitoring internal procedures or guidelines for its Cardholders' use of the Cards. The Bank shall have no obligation to inquire or verify whether any use of a Card or any Charge to the Card Account complies with such procedures or guidelines.

   (b) The Company authorizes the Program Administrator(s) (designated on Schedule A) to complete, on behalf of the Company, documentation in connection with the day-to-day operation and administration of the Program (each a "Request"). The Bank may deal with any person who identifies himself/herself as a Program Administrator in all matters relating to the operation and administration of the Program and is entitled to rely on any Request or notice signed by any Program Administrator and on any instructions, authorization or information received from such person. The Bank is not responsible for any Program Administrator that exceeds the limits of their authority. The Company may change the person(s) designated as a Program Administrator by written notice to the Bank and any such change shall be effective upon receipt by the Bank of such notice, after the Bank has a reasonable opportunity to act.

   (c) The Company recognizes that unencrypted email is inherently insecure and that all data communications and transfers occur openly and can be monitored, intercepted, rerouted, copied and read by others. If the Company chooses to communicate with the Bank using unencrypted email, the Company assumes the entire risk for its unencrypted electronic communications.

   (d) The Company shall provide to the Bank the identification information regarding each Cardholder as described on Schedule A and update this information as requested by the Bank from time to time during the term of this Agreement. The Company is responsible for notifying each Cardholder that such identification information is being provided to the Bank for the purpose of establishing a Card Account.

5. **Card Issuance to Cardholders.** The Company shall send a Request for Cards to be issued to Cardholders with the name and Card Credit Limit (subject to the Bank's approval) for each designated Cardholder. Upon receipt of a Request, the Bank will issue and send to each Cardholder a Card together with a copy of the Bank's then current Cardholder Agreement. The Bank may issue renewal, replacement or temporary replacement cards for any Card from time to time.

6. **Company and Cardholder Liability/ Payment Procedure.**

   (a) The Company shall be liable for all Charges and Fees even if the aggregate of all outstanding Charges and Fees exceeds the Company Credit Line or the Cardholder exceed his or her authority. The Bank will send the Company and each Cardholder periodic statements in a manner agreed upon by the parties detailing the Charges and Fees which are due upon receipt and must be paid in full by the Company on or before the payment due date stated in the periodic statement.

   (b) All payments shall be made in U.S. dollars which are drawn on a U.S. financial institution. Payments shall be made by mail at the address shown on the periodic statements or by other electronic means agreed upon by the parties. Payments shall be deemed paid upon receipt and shall be credited as of the date of such receipt. If the Bank receives a payment in an amount less than the outstanding balance shown on the periodic statement, the Bank may apply such partial payments to the balance as the Bank elects.

7. **Liability for Unauthorized Use. The Company agrees to promptly notify the Bank of any lost or stolen Card, Unauthorized Use of a Card, and/or termination of the employment of any Cardholder (call toll free at 1-800-836-8562).** The Company is liable for all extensions of credit obtained through the use of the Company Account by (i) a Cardholder and (ii) any Authorized User whether or not (aa) the Bank is notified about such Authorized User's use and/or (bb) the Authorized User exceeds the limit the Company or Cardholder authorized or intended. The Company shall not be liable for any Unauthorized Use of any Card unless the Unauthorized Use occurs as a result of the Company's lack of reasonable security precautions and controls regarding the Cards or the Unauthorized Use results in a benefit, directly or indirectly, to the Company. Written notification can be sent to SunTrust Bank at, P.O. Box 598202, Orlando, Florida 32859-8202.

8. **Visa Corporate Waiver Protection Program.** The Company may be eligible for reimbursement under the Visa Corporate Waiver Protection Program attached as Schedule E ("Visa Waiver Program"). The type and amount of Charges which qualify for reimbursement shall be determined by Visa and Visa may change the terms of the Visa Waiver Program at any time.

9. **Termination.**

    (a) Unless terminated earlier as provided in this Agreement, the initial term of this Agreement shall be for <u>three (3)</u> years from the date of execution by both parties and shall continue thereafter under the terms and conditions contained herein (as may be amended from time to time), provided, however, either party may terminate this Agreement at any time upon at least sixty (60) days prior written notice.

    (b) Either party may terminate this Agreement effective immediately if the other party:

    (i) fails to make any payment required under this Agreement when due and such failure continues for thirty (30) days thereafter,

    (ii) fails to pay any other obligation to the other party or its Affiliates when due and such failure continues for thirty (30) days thereafter,

    (iii) fails to perform any material term or condition of this Agreement and such failure is not cured within thirty (30) days following receipt of written notice thereof,

    (iv) breaches any representation or warranty under this Agreement and such breach is not cured within thirty (30) days following receipt of written notice thereof,

    (v) experiences an insolvency or the filing of bankruptcy proceedings against it,

    (vi) experiences a liquidation or dissolution,

    (vii) with respect to the Company, supplies any credit information that is false,

    (viii) with respect to the Company, is sold, merged, dissolved, or otherwise ceases to do business,

    (ix) with respect to the Company, garnishment or attachment proceedings are initiated against it or its property, or

    (x) as otherwise provided in this Agreement.

    (c) Upon termination of this Agreement:

    (i) all outstanding Cards shall be cancelled and all rights or benefits of the Company or any Cardholder with respect to the Cards shall be revoked or withdrawn;

    (ii) the Company shall immediately be liable for the aggregate of all Charges and Fees whether or not then posted to the Company Account or any Card Account, including without limitation Charges not yet incurred, accrued Fees and interest accrued or to accrue, and all such sums shall immediately be due and payable by the Company;

    (iii) the Bank has the right to set-off any of the Company's accounts with the Bank or any of the Bank's Affiliates in order to pay sums due under this Agreement; and

    (iv) the Company shall pay any and all costs, expenses, and attorneys' fees (including allocated costs for in-house counsel expenses) for the collection of sums due and owing under this Agreement.

10. **Cards and Cancellation of Cards.**

    (a) All Cards remain at all times the property of the Bank, cannot be transferred and shall be destroyed or surrendered to the Bank upon demand. Notwithstanding any other provision in this Agreement, the Bank may cancel or suspend the right to use any Card for any reason without notice.

(b) In the event a Cardholder's or Authorized User's employment or other relationship with the Company is terminated, the Company shall immediately notify the Bank and Request cancellation of such Cardholder's or Authorized User's Card. Until the Company's cancellation notice is received by the Bank and the Bank has the reasonable opportunity to act, the Company shall be liable for all Charges (including non-Business Charges) and Fees to the Card Account made after such Cardholder's or Authorized User's termination.

(c) The Company may direct the Bank to cancel any Card at any time for any reason by providing a written Request to the Bank. The Company shall be liable for all Charges and Fees to the Card Account made prior to the time the Bank receives the Request and has a reasonable opportunity to act.

(d) The Company shall be liable for any pre-authorized payments charged to a Card Account, even after the Card is cancelled, unless the Company provided a written cancellation request to the merchant prior to the Charge. If requested, the Company shall provide the Bank with a copy of the written cancellation request to the merchant.

## 11. Issuance of PINs/Liability.

(a) At the Company's Request, the Bank may issue a Cardholder a personal identification number ("PIN") enabling the Cardholder to use the Card at accessible ATMs to obtain Cash Advances. The Company shall instruct each Cardholder not to disclose the Cardholder's PIN to any other person. Transaction records issued by an ATM are solely for the Company's convenience and in the event of any dispute as to the accuracy of such records, the Bank's internal records shall be conclusive.

(b) In the event a Cardholder's PIN is disclosed to any unauthorized person, whether by a Cardholder's failure to maintain confidentiality of the PIN, failure to keep the PIN and the Card separate, or otherwise, the Company shall be liable for all Charges through use of the PIN whether or not incurred by the Cardholder.

## 12. Representations and Warranties. The Company represents and warrants that;

(a) it has the requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement,

(b) it is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which such authority is required to fulfill its obligations hereunder, and

(c) its execution of this Agreement will not violate any other agreement between such party and any third party.

The Company's failure to fulfill the above representations and warranties shall be deemed a material default and the Bank shall, upon notice to the Company, have the right to immediately terminate this Agreement and all sums owed hereunder shall be immediately due and payable.

## 13. Limitation of Liability/Indemnification.

(a) The Bank is not liable for any claim made or loss or damages suffered by the Company arising directly or indirectly from the Company's use of the Program except for damages which the Company suffers as a result of the Bank's gross negligence or willful misconduct related to the terms of this Agreement. The Company agrees to the maximum extent provided by law that the Bank will never be liable for any special, punitive, exemplary, indirect or consequential damages, including but not limited to, lost profits and lost revenues, without regard to the form of the Company's claim or action or whether the Company's claim is in contract, tort or otherwise, and even if the Bank knew such losses or damages were possible or likely.

(b) The Bank always attempts to ensure that its Program will be operational, and to respect any available Card Credit Limit or any other available limit requested by the Company. However, the Bank cannot warrant that the Program will be uninterrupted or error-free or that such limits will always be respected in each case, due to limitations of the Bank's authorization systems, systems management and ordinary stand-in processes, and of the Visa commercial card system including merchant set-up features. The Company therefore waives any and all claims that it may have against the Bank arising out of the use and performance of the Program, except for claims for damages referred to in Section 13(a).

(c) The Bank is not responsible for any defects in or poor quality of the merchandise or services obtained by means of any Card. Any claim or dispute between the Company and a merchant or supplier, including with respect to the merchant's or supplier's right to compensation, will be the object of a direct settlement among the

Company and the merchant or supplier and any such dispute shall not affect the Company's obligation to pay all Charges in full to the Bank in accordance with the terms of this Agreement.

(d) The Company also acknowledges that some benefits or enhancements may be supplied by firms independent of the Bank and the Bank is not responsible or liable for anything in connection with those benefits or enhancements.

(e) The Company shall indemnify, protect and hold the Bank harmless from and against any and all losses, damages, liabilities, claims, demands, and judgments (collectively "Claims"), together with all costs, charges, and expenses, imposed in any manner upon or accruing against the Bank relating to the performance of the Bank under this Agreement, including, but not limited to, disputes between (i) the Company and any Cardholder (including Claims arising out of the Bank's use of Cardholder personal information for obtaining credit information) and (ii) the Company and any Affiliate (including Claims arising out of actions taken by the Company on an Affiliate's behalf under this Agreement and any Addendum) unless such Claim is solely the result of Bank's gross negligence or willful misconduct. The Company will, at its own expense, defend any action or proceeding brought against the Bank in connection with any such Claim.

14. **Unassigned Cards.** Upon the Company's Request, the Bank, in its sole discretion, may issue one or more "Unassigned Cards." "Unassigned Cards" are Cards issued in the name of the Company only without designating a specific Cardholder as authorized to use the Card. Any person using the Card from time to time shall be the "Cardholder" of the Card. The Bank is not liable for any refusal to honor the Unassigned Card by any other bank or any seller or lessor of goods or services based upon the absence of the Cardholder's name and signature/ID of an individual Cardholder. The Bank will not issue a PIN in connection with an Unassigned Card and no Cardholder may obtain Cash Advances. The Bank will provide Card Account statements for each Unassigned Card to the Company. Notwithstanding anything stated herein to the contrary, the Company understands the increased risk involved in using Unassigned Cards and agrees to assume full liability for all Charges and Fees made with the Unassigned Card, whether or not the Charges were authorized or unauthorized. The Company shall indemnify the Bank from and against any and all liability, claims, demands, judgments, or other disputes, together with all costs, charges and expenses imposed in any manner upon or accruing against the Bank or arising out of, or in any way relating to the Bank's issuance of Unassigned Cards.

15. **Disputes and Chargebacks.**

    (a) The Bank will send the Company and each Cardholder periodic statements detailing the Charges and Fees to the Card Accounts. If the Company (or Cardholder) does not notify the Bank of a dispute with regard to any Charge or Fee within sixty (60) days after the billing cycle date, the Company agrees that the periodic statement shall be deemed conclusively to be correct.

    (b) In the event a transaction is posted to a Card Account involving a fraud, Unauthorized Use or other situation in which a merchant may be liable for such transaction under the applicable Visa Operating Regulations, the Company or Cardholder shall notify the Bank immediately. The Company or Cardholder shall provide the Bank a written statement specifically describing the circumstances of such transaction. The Bank shall attempt to charge the transaction back to the merchant in accordance with the Visa Operating Regulations and any chargeback accepted by Visa will be credited to the Company's next periodic statement.

    (c) The Bank shall not accept checks, money orders, or any other items for payment marked "payment in full" (or other similar language) if such payment is less than the full amount due except by a written agreement signed by an authorized officer of the Bank. All communications regarding disputed charges, including checks, money orders, or any other items sent as "payment in full" of a disputed amount must be sent to the SunTrust Bank, P.O. Box 4910, Orlando, Florida 32802-4910.

16. **Amendment.** The terms and conditions of this Agreement and the Company's right to use the Card may be altered or amended by the Bank at any time at the Bank's sole discretion by written notice to the Company not less than thirty (30) days prior to the effective date of the amendment. Use of the Card after the effective date of the amendment constitutes acceptance of the alteration or amendment. Any such amendment is effective upon the date stated in the notice. Any other modification, amendment, or waiver of this Agreement by Company, whether in whole or in part must be in writing, signed by both parties.

17. **Assignment/Telephone Monitoring/Credit Information.**

    (a) The Bank may assign all rights under this Agreement to another bank, company, or an Affiliate of the Bank without prior notice. The Company may not assign or transfer this Agreement or any Card without the Bank's

prior written consent. The merger or consolidation of the Company shall be deemed to be an assignment of this Agreement. If transferred or assigned without the Bank's prior written consent, this Agreement will be deemed terminated.

(b) The Bank has the right to monitor telephone calls relating to its performance under this Agreement. Such monitoring shall be conducted by the Bank's employees or agents and all information shall remain confidential.

(c) The Bank is authorized to make whatever credit inquiries regarding the Company it deems appropriate and to share information regarding the Company Account with the Bank's Affiliates.

18. **Periodic Review/Financial Information.** The Company understands and acknowledges that the Bank has provided the Program to the Company on the basis of the Company's financial condition at the time the Company applied for the Company Account. Upon the Bank's request, the Company agrees to submit to the Bank from time to time updated financial information. If the Company fails to submit financial information when requested by the Bank or if, based upon review of the submitted financial information, the Bank determines that the Company's financial condition has adversely changed, this Agreement may be immediately terminated by the Bank.

19. **Confidentiality/Privacy.**

    (a) <u>Restrictions</u>. The parties understand and agree that they may be provided or otherwise may obtain the Confidential Information of the other party. The parties agree, unless otherwise stated herein, that

    (i) they will keep all Confidential Information in strict confidence, using such degree of care as appropriate to avoid unauthorized use or disclosure;

    (ii) they will not, directly or indirectly, disclose any Confidential Information to any third party, except with the other party's prior written consent; and

    (iii) upon the termination of this Agreement or at any time either party may request, the receiving party will deliver to the disclosing party, or, at the disclosing party's option, will destroy all Confidential Information that the receiving party possesses or has under its control, provided, however, the Bank has the right to retain a reasonable number of copies of Confidential Information as may be required by applicable law.

    (b) <u>Permitted Disclosures</u>. Notwithstanding anything stated herein to the contrary, the parties are permitted to use and/or disclose the Confidential Information as follows:

    (i) The parties may disclose to their personnel, state and federal regulators, and agents having a need to know such Confidential Information in connection with the implementation and operation of the Program in accordance with this Agreement. The parties will instruct all their respective personnel and agents as to their obligations to be bound by the terms and conditions of this Agreement prior to their being given access to the Confidential Information.

    (ii) The parties may disclose the Confidential Information pursuant to the order or requirement of a court, administrative agency, or other governmental or law enforcement body having jurisdiction over the receiving party (provided, however, if permitted by applicable law, each party will notify the other party in writing in advance of such disclosure so that the other party may take appropriate action to protect the Confidential Information) or on a confidential basis to the receiving party's legal, financial, or security advisors.

    (iii) The Bank may use and disclose Personally Identifiable Information as follows, provided that at all times the Bank complies with all applicable laws and regulations: (aa) to process Card transactions and to otherwise maintain and support the Company's and Affiliates' Card Accounts; (bb) to communicate with the Company and Affiliates regarding issues relating to Card transactions; (cc) for internal business planning purposes; and (dd) to obtain services from third parties, provided that any such third party is bound by obligations prohibiting use by or disclosure to any third party of such Personally Identifiable Information other than for purposes of performing services as required hereunder. Notwithstanding the above, the Bank shall not use or sell the Personally Identifiable Information for the purpose of soliciting Cardholders for services not related to this Agreement, provided that the Bank may solicit any Cardholder whose name is obtained through a source other than the Personally Identifiable Information obtained by the Bank under this Agreement.

(iv) The parties agree that any data or information other than Personally Identifiable Information that relates in any manner to Card usage and that is acquired by the Bank in the course of its provision of its services under this Agreement will belong equally to the parties, and nothing in this Agreement shall prohibit either party from disclosing or using such data or information in its aggregate form.

(c) Remedies. The parties acknowledge that the disclosure of Confidential Information may cause irreparable injury and damages, which damages may be difficult to ascertain. Therefore, upon a disclosure or threatened disclosure of any Confidential Information, the disclosing party will be entitled to injunctive relief (without being required to post bond), including, but not limited to, a preliminary injunction and the receiving party will not object to the entry of an injunction or other equitable relief against it on the basis of an adequate remedy at law, lack of irreparable harm or any other reason. Without limiting the foregoing, each party will advise the other party immediately in the event that it learns or has reason to believe that any person or entity that has had access to Confidential Information, directly or indirectly, through the parties, has violated or intends to violate the terms of this Agreement. This provision will not in any way limit such other remedies as may be available to the parties at law or equity.

20. **Enforcement of Rights and Governing Law.** This Agreement is binding upon the assigns and successors of the Company. Except to the extent federal law is applicable, the interpretation, effect, and validity of this Agreement shall be governed by the laws of the State of Florida. If any portion of this Agreement is declared invalid or unenforceable for any reason, such portion is deemed severed and the remainder of this Agreement shall remain fully valid and enforceable. The Bank can delay enforcing its rights under this Agreement without waiving those rights. A waiver of rights in one instance shall not be a waiver in other instances.

21. **Survival.** Sections 3 - 7; 9; 12 - 21; and 23, and all other provisions of this Agreement which may reasonably be interpreted or construed as surviving the termination thereof, shall survive the termination of this Agreement.

22. **Miscellaneous.** The non-performance of a party will be excused for the period of any delay caused by any force majeure event, including act of God, war, terrorism, or any other cause beyond the party's reasonable control. If any provision of this Agreement is held to be unenforceable, such provision will be reformed only to the extent necessary to make it enforceable. Each party to this Agreement is responsible for compliance with the Agreement by its Affiliates and their respective employees and authorized agents.

23. **Jury Trial Waiver.** THE PARTIES SPECIFICALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY COURT WITH RESPECT TO ANY CONTRACTUAL, TORTIOUS, OR STATUTORY CLAIM, COUNTERCLAIM, OR CROSS-CLAIM AGAINST THE OTHER ARISING OUT OF OR CONNECTED IN ANY WAY TO THIS AGREEMENT, BECAUSE THE PARTIES HERETO, BOTH OF WHOM ARE REPRESENTED BY COUNSEL, BELIEVE THAT THE COMPLEX COMMERCIAL AND PROFESSIONAL ASPECTS OF THEIR DEALINGS WITH ONE ANOTHER MAKE A JURY DETERMINATION NEITHER DESIRABLE NOR APPROPRIATE.

24. **Counterpart.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

25. **Facsimile and Email Delivery.** A duplicate or copy of this signed Agreement delivered by through facsimile or email attachment shall be as effective and enforceable as an original manually signed Agreement. A digital, electronic or photo static image of this signed Agreement maintained in the Bank's record retention system shall be as effective and enforceable as an original manually signed Agreement.

26. **Entire Agreement.** This Agreement and the incorporated Schedules, Addendums and Exhibits constitute the entire Agreement between the parties. There are no understandings or agreements related hereto other than those which are expressed herein, and all prior negotiations, agreements, and understandings, whether oral or written, are superseded by this Agreement.

27. **Bank Secrecy Act Requirements.** In order to comply with the reporting requirements of the Bank Secrecy Act and the USA PATRIOT Act, the Bank is required to obtain, verify and record the following information from the Company and its Affiliates prior to establishing a new account: legal entity name, street address, taxpayer identification number and other information that allows the Bank to identify the Company and its Affiliates.

The parties have caused this Agreement to be executed by their duly authorized representative as of the date set forth below.

| SunTrust Bank | Taylormade Creations, In |
|---|---|
| By: *(signature)* | By: |
| Name: Geoffrey B. Dean | Name: *(signature)* Steve A Fultz |
| Title: Group Vice President | Title: Vice President |
| Date: 4-17-2009 | Date: March 10, 2009 |

ATTEST: _____

Print Name: _____

**SCHEDULE A**
**To Visa Commercial Card Agreement**

| Company (Parent) | Company Affiliate (If applicable) |
|---|---|
| Taylor made Creations, Inc | |

I. **Commercial Card Program.**

   ☒ Visa Purchasing Card    ☐ Visa Corporate Card

II. **Cardholder Information Requirement.**

   The Company shall provide the following Cardholder Information:
   Name, business address, billing address, telephone number, and the last four digits of the cardholder's social security number

III. **Card Delivery.** The Card(s) shall be delivered to:

   ☒ The Company at:

| Attention | | | |
|---|---|---|---|
| Elaine Derstine | | | |
| Street Address | City | State | Zip Code |
| 7108 Crossroads Blvd. Ste. 308 | Brentwood | TN | 37027 |

   ☐ The Individual Cardholder

IV. **Program Administrators.** The Company designates the following individual(s) as an authorized Program Administrator(s) to submit Requests to Bank:

| Name | Signature | Title | | |
|---|---|---|---|---|
| Elaine Derstine | Elaine Derstine | Financial Coordinator | | |
| Street Address | City | | State | Zip Code |
| 7108 Crossroads Blvd Ste 308 | Brentwood | | TN | 37027 |

| Name | Signature | Title | | |
|---|---|---|---|---|
| Steve A. Fultz | Steve A Fultz | Vice President | | |
| Street Address | City | | State | Zip Code |
| 7108 Crossroads Blvd Ste 308 | Brentwood | | TN | 37027 |

| Name | Signature | Title | | |
|---|---|---|---|---|
| | | | | |
| Street Address | City | | State | Zip Code |
| | | | | |

| Name | Signature | Title | | |
|---|---|---|---|---|
| | | | | |
| Street Address | City | | State | Zip Code |
| | | | | |

The Company and each Affiliate may change its designated Program Administrator(s) by delivering a new, signed Schedule A to the Bank. Each subsequent Schedule A Program Administrator designation will supersede any and all prior Schedule A designations previously submitted by the Company or Affiliate.

V. **Company Credit Line.** ~~~~~ $150,000.00

**SCHEDULE A (Continued)
To Visa Commercial Card Agreement**

## VI. Account Controls.

(A) <u>Card Accounts</u>: Specific controls regarding Card Accounts are established during the implementation process and may be amended from time to time by the Company or the Bank. Card Account controls may be amended from time to time by the Bank and may be amended by the Company only upon prior written approval of the Bank.

(B) <u>Emergency Replacement Cards</u>: In the event any Card is lost, stolen, or damaged and a replacement Card is required during weekends, holidays, or Bank closing hours, the Cardholder may call Visa to obtain a temporary Visa Emergency Replacement Card. The Company understands and acknowledges that Visa Emergency Replacement Cards are not controlled by the Company's account controls set forth on the Implementation Form but, rather, are controlled in accordance with the standard Visa operating procedures in effect at the time of replacement. The Visa Emergency Replacement Cards are valid for a limited period of time and the Cardholder must immediately contact the Bank for a permanent Card which shall be issued with the Company's account controls.

Company: Taylormade Creations, Inc.

By: Steve A. Fultz

Name: Steve A. Fultz

Title: Vice President

Date: March 10, 2009

**SCHEDULE B**
**To Visa Commercial Card Agreement**

Company: Taylor made Creations    Date: 3-10-2009

**Fee Schedule**

| Card Fees | |
|---|---|
| Item | Cost |
| Card Logo Design (one color, standard) | Waived |
| Annual Card Fee | Waived |
| Annual Visa Extra Rewards Fee (Corporate Card Only) | $75, per enrolled card |
| Cash Advance Fee | 3% ($3 minimum/$30 maximum) |
| Late Fee Central Bill | 1% of outstanding balance |
| Late Fee Individual Bill (Corporate Card Only) | $15 |
| Foreign Transaction Fee | Pass through from Visa (currently 1%) |
| Non-Sufficient Fund Fee | $29 each |
| Copy of Sales Slips & Statements | $3 each |
| Card Replacement Fee | None |
| "Rush" Delivery Fee for Card Replacement | $15 |

| Enterprise Spend Platform Technology Fees | |
|---|---|
| Item | Cost |
| **ESP Statement Manager** | |
| Set-up Fee | $0.00 |
| Per Statement Fee | $0.00 |
| 3rd Party Data Import Set-up Fee (non-SunTrust) | $1,000 per 3rd Party |
| 3rd Party Statement Fee | $2.00 per active statement (monthly) |
| **ESP Transaction Manager** | |
| Single-level Approval Set-up Fee | $1,000 * |
| Multi-level Approval Set-up Fee | $5,000 * |
| **ESP Expense Manager** | |
| Set-up Fee | $5,000 |
| **Per Expense Report Option** | |
| Per Expense Report | $0.50 |
| Per Expense Report without SunTrust Card spend (>10% of Reports) | $1.00 ** |
| **Per Active User Option** | |
| Per Active User | $2.00 per month |
| Per Active User without SunTrust Card spend (>10% of Active Users) | $4.00 per month ** |
| **ESP Payables Manager** | |
| Set-up Fee | $5,000 |
| **ESP Requisition Manager** | |
| Set-up Fee | $0.00 |
| Custom ETI Fee | Up to $1,000 per ETI |
| Per Requisition without SunTrust Cards spend (>10% of Requisitions) | $0.15 per Requisition *** |
| **Miscellaneous** | |
| Mobile Device Access | $2.00 per monthly active user |
| Per Image Fee | TBD |
| Professional Services | $100 per hour |

* (One-time fee for creation of approval workflow, integration to the Company's accounting system, and training.)

** (Applies when greater than 10% of the Expense Reports or greater than 10% of the Active Users submit Expense Reports without linked SunTrust Card Spend. Fee will be assessed to each Expense Report or each Active User without linked SunTrust Card Spend.)

*** (Applies when greater than 10% of the Requisitions generated are not linked to SunTrust Card Transactions. Fee will be assessed to each Requisition without linked SunTrust Card Spend.)

## SCHEDULE B (Continued)
## To Visa Commercial Card Agreement

**Net-Spend Rebate Program**

In accordance with the table, below, at the end of each rebate period, the Company shall receive a revenue share of its Net Spend* based upon the following calculation. The Annual Spend* amount shall determine the Rebate Rate. The Net Spend shall be the Annual Spend less "Cash Transactions" ("Cash Transactions" mean transactions from financial institutions such as cash advances, convenience checks, travelers' checks, gift cards, etc.) and Visa Large Ticket transactions. At the end of each rebate period, the Net Spend Rebate* shall be the Net Spend for the rebate period, multiplied by the Rebate Rate described below and reduced by charge-offs (which may carry over to subsequent rebate periods). Charge-offs mean all amounts that remain unpaid by the Company or Cardholder for a period of 180 days, including personal charges made by the Cardholder or Authorized User.

Rebate periods are yearly (on a 12-month cycle) commencing on the first cycle date the Company is activated on the Bank's processing system and shall continue for consecutive yearly periods during the term of the Agreement. Rebate payments shall be paid to the Company by check within sixty (60) days after the end of each rebate period.

| P-CARD | REBATE RATE | | | CORP. CARD | REBATE RATE |
|---|---|---|---|---|---|
| | Monthly Bill | 2x Monthly Bill | Weekly Bill | | Monthly Bill |
| Annual Spend | 18 day Payment | 10 day Payment | 5 day Payment | Annual Spend | 25 day Payment |
| $1.5MM - $5MM | 0.50% | 0.59% | 0.66% | $1MM - $5MM | 0.45% |
| to $10MM | 0.55% | 0.64% | 0.71% | to $10MM | 0.50% |
| to $15MM | 0.60% | 0.69% | 0.76% | to $15MM | 0.55% |
| to $20MM | 0.65% | 0.74% | 0.81% | to $20MM | 0.60% |
| to $25MM | 0.68% | 0.77% | 0.84% | to $25MM | 0.63% |
| to $30MM | 0.71% | 0.80% | 0.87% | to $30MM | 0.66% |
| to $35MM | 0.74% | 0.83% | 0.90% | to $35MM | 0.69% |
| to $40MM | 0.77% | 0.86% | 0.93% | to $40MM | 0.72% |
| to $45MM | 0.80% | 0.89% | 0.96% | to $45MM | 0.75% |
| to $50MM | 0.83% | 0.92% | 0.99% | to $50MM | 0.78% |
| to $60MM | 0.86% | 0.95% | 1.02% | to $60MM | 0.81% |
| to $70MM | 0.89% | 0.98% | 1.05% | to $70MM | 0.84% |
| to $80MM | 0.92% | 1.01% | 1.08% | to $80MM | 0.87% |
| to $90MM | 0.95% | 1.04% | 1.11% | to $90MM | 0.90% |
| to $100MM | 0.98% | 1.07% | 1.14% | to $100MM | 0.93% |
| > $100MM | 1.01% | 1.10% | 1.17% | > $100MM | 0.96% |

\* Net Spend Rebate = [Net Spend x Rebate Rate] – [Chargeoffs]
Net Spend = [Annual Spend] – [Visa Large Ticket] – [Cash Transactions]
Annual Spend = [Purchases] + [Cash Transactions] – [Credits] – [Fees]

# Schedule C
## Company's Affiliates

## Schedule D
## Cardholder Agreement

### Visa Commercial Card Cardholder Agreement

The SunTrust Visa Commercial Card is being issued to you at the request of your Employer. "Card" means the enclosed Visa Card (and all replacements) issued by SunTrust Bank (the "Bank"). "Card Account" means the account established by the Bank in connection with your Card. "Charges" means all purchases and cash advances charged to the Card Account. "Employer" means the Company (or other business sponsor) that authorized the Bank to issue the Card to you as an employee to use for legitimate business purposes. "Fees" means the fees under the Card Account established by your Employer's program administrator. This cardholder agreement (the "Agreement") is between the Bank also referred to as "we", "our", and "us" and you (also referred to as the Cardholder).

You agree to the terms and conditions below.

### Liability and Use of the Card

1. By accepting, signing or using the Card or the Account you are agreeing to the terms and conditions of this Agreement.

2. You agree that this Card will be used only by you solely for legitimate business purposes as defined by the Employer. You agree not to use the Card for personal, family or household purposes.

3. The Credit Limit for your Card will be established from time to time as requested by the Employer and approved by the Bank. At your Employer's request, a portion of your Credit Limit may be available for cash advances. You agree not to use your Card in any manner which would cause the aggregate of your Charges and Fees to exceed, at any time, such Credit Limit. The Bank may approve transactions which exceed your Credit Limit, but the Bank is not obligated to do so. The Bank may increase or decrease your Credit Limit or change the portion available for cash advances at any time without prior notice to you. The Bank is not responsible if any merchant, financial institution or other person refuses to honor the Card.

4. You may use the Card to charge purchases to the Card Account and, if permitted by the Employer, to obtain cash advances, either directly from us, through use of an ATM, or through another financial institution honoring the Card; or purchase a money order, travelers check or similar item (each a "cash advance"). Any such use of a Card results in a Charge to the Card Account, whether or not the Card was presented (such as Internet, mail or telephone order purchases), your signature was obtained, or you used a PIN."

5. We shall record all Charges with respect to your Card, as well as all Fees, service charges, credits and adjustments against the Card Account.

6. You may not return any purchase which you obtained with the Card for a refund, other than by way of a Card Account credit. Upon receipt of a credit issued by a merchant, the Bank shall post the credit to the Card Account. If the Bank does not receive the credit prior to the time the related purchase is included in the Card Account Statement (as defined below), the amount of the related purchase shall be paid by the stated payment due date.

7. We shall not be responsible for any defect in, or the quality of any purchase obtained from a merchant. Any claim or dispute between you and any merchant with respect to any purchase, including any right to set-off or compensation, shall be settled directly between you and the merchant and shall have no effect on your indebtedness to us. We will not be responsible, nor will you seek to hold us responsible, if any merchant refuses to honor the Card, or for any other problems you may have with any merchant.

8. You acknowledge that the Card does not provide you with Visa card benefits or features except for those agreed to by your Employer.

### Automated Teller Machines (ATM's)

9. Use of your Card and PIN for transactions on ATM's will be governed by this Agreement as may be amended from time to time.

10. Transaction records issued through ATM's are solely for your convenience and, in the event of any dispute as to the accuracy of any such record, our decision based on our internal records shall be conclusive and binding on you.

## Schedule D (Continued)
## Cardholder Agreement

11. We reserve the right without notice to withdraw and/or cancel your privilege of use of ATM's.

12. Transactions at ATM's other than the Bank's may be subject to separate or additional conditions.

### Statements; Account Settlement

13. We will send you a periodic statement of account (a "Card Account Statement") for each month in which Charges have been posted to your Card Account or there is an outstanding balance. You are responsible for promptly submitting expense reimbursement requests to your Employer for all Charges and Fees in accordance with your Employer's internal policies and procedures. If requested by the Bank, you agree to confirm in writing the Charges and Fees for which you have submitted expense reimbursement requests to your Employer.

14. Promptly upon receipt, you agree to examine each periodic Card Account Statement. If you do not notify the Bank of an error or omission with regard to any Charge to the Card Account within sixty (60) days after the billing date, you agree that such Card Account Statement shall be deemed conclusively to be correct.

15. The Bank and Visa convert any Charge made in a foreign currency into U.S. dollars using the conversion rate in effect on the day the transaction is posted to the Card Account (currently either a wholesale market rate or a government-mandated rate) and adds a Visa conversion charge and the Bank's current conversion charge, not to exceed 2% of the Charge amount (the "Foreign Exchange Fee"). The currency conversion rate and Foreign Exchange Fee may not be the same as existed on the day you made the transaction. The Bank and Visa will use this procedure if a credit is subsequently given for the transaction. The currency conversion rate on the date of the original transaction may differ from the rate in effect on the date the credit was issued. The Bank will deduct the Foreign Exchange Fee from this credit amount. As a result, the amount of the credit may be different from the amount that was originally charged to the Card Account for the transaction. The amount of the transaction after conversion (including Foreign Exchange Fee) is shown on the Card Account Statement as either a purchase or cash advance.

### Lost or Stolen Card; Disclosure of PIN; Liability

16. **You agree to promptly notify the Bank of any lost or stolen Card or Unauthorized Use of a Card (call toll free at 1-800-836-8562).** There shall be no liability for any Unauthorized Use of any Card unless the Unauthorized Use occurs as a result of the your lack of reasonable security precautions and controls regarding the Cards or the Unauthorized Use results in a benefit, directly or indirectly, to you and/or your Employer. "Unauthorized Use" means the use of a Card by a person other than you or an authorized user who does not have actual, implied, or apparent authority for such use, and from which the Employer, you and/or an authorized user received no benefit, directly or indirectly. Written notification can be sent to SunTrust Bank at, P.O. Box 598202, Orlando, Florida 32859-8202.

17. If your Employer has requested issuance of a personal identification number ("PIN") to you, you will not disclose the PIN to any person and you will keep your PIN separate from your Card. **In the event that the PIN has been stolen, you must notify the Bank immediately (call toll free at 1-800-836-8562).** In the event your PIN is disclosed to any unauthorized person, whether by your failure to maintain confidentiality of the PIN, failure to keep the PIN and the Card separate or otherwise, you shall be liable for all transactions through use of the PIN whether or not incurred by you.

### Cancellation

18. The Card at all times remains our property and we have the right at any time, without notice, to cancel the Card and to revoke or withdraw all your rights or privileges in respect of the Card. The Employer may cancel your Card at any time for any reason. Upon cancellation, you cease to be entitled to use the Card or to be entitled to any benefits or features available with respect to the Card and you shall immediately return the Card to us or surrender it to our agents upon request. Use of the Card or Card Account after notification of its cancellation may be fraudulent and may result in the Bank taking legal action against you. Even after the Card Account is closed, you remain responsible for any Charges according to the terms of this Agreement.

19. We may inform merchants honoring the Card that it has been cancelled or revoked and, if you are asked to surrender an expired or revoked Card by a merchant, you must do so.

## Schedule D (Continued)
## Cardholder Agreement

### Credit and Personal Information; Telephone Monitoring

20. Information concerning your use of the Card or Card Account may be furnished by the Bank to the Employer. The Employer has provided us with your personal information for the purpose of establishing your Card Account. Upon request, you agree to promptly give the Bank accurate information about yourself including updated financial and location information. To improve customer service and security, your telephone communications with the Bank may be monitored and recorded.

### Amendments and Waiver

21. We may amend or modify any of the terms of this Agreement, your Credit Limit and/or any benefits or features available or offered with the Card at any time and the changes can apply to all outstanding indebtedness and to any future Charges on your Card Account. We may replace the Card at any time. We reserve the right to amend or discontinue any benefit or privilege available with respect to the Card.

22. No term or provision of this Agreement will be deemed to have been waived and no breach excused, unless such waiver or consent to breach shall be in writing and signed by the party claimed to have waived or consented. Any express or implied consent to any party to, or waiver of, a breach by the other shall not constitute a consent to, waiver of, or excuse for any other different or subsequent breach.

### Miscellaneous

23. If any provision of this Agreement is held to be unenforceable, invalid or void, all other provisions will nevertheless continue in full force and effect.

24. This Agreement shall be governed by and construed in accordance with the laws of the state of Florida and applicable federal law. THE CARDHOLDER IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF FLORIDA AND THE UNITED STATES OF AMERICA AND VENUE IN ORANGE COUNTY FLORIDA AND AGREES THAT ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT MAY BE COMMENCED IN SUCH COURTS. CARDHOLDER AND THE BANK EACH IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING RELATED TO THIS AGREEMENT.

**SCHEDULE E**
**Visa Corporate Waiver Protection Program**

347272 (4/08)
SunTrust Corporate Forms